UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
UNITED STATES OF AMERICA,        )
ex rel. GORDON GREEN,            )
                                )
        Plaintiff,               )
                                )
        v.                       ) Civil Action No. 09-738 (RWR)
                                )
SERVICE CONTRACT EDUCATION       )
AND TRAINING TRUST FUND, et al., )
                                )
        Defendants.              )
_____ )

MEMORANDUM OPINION

Gordon Green filed a complaint against the Service Contract
Education and Training Trust Fund ("SCETTF"), the Laborers'
International Union of North America ("LIUNA"), and twenty-nine
government contractors, alleging that the defendants violated the
False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, by engaging in a
scheme to defraud the United States by submitting false and
fraudulent claims concerning fringe benefit programs that SCETTF,
at the behest of LIUNA, provided to the contractor defendants in
connection with federal service contracts.  The United States
elected not to intervene in the action.  Following notice of that
decision, Green dismissed voluntarily his claims against twenty-
four of the contractors.  SCETTF, LIUNA, and four of the five
remaining contractors -- Integrity Management Services, Inc.,
Crothall Healthcare, Inc., Kentucky Building Maintenance, Inc.,
and National Maintenance, Inc. (the "contractor defendants") --

- 2 -

moved to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim.[1]  Green's complaint alleges two bases for concluding that defendants misrepresented to government officials that training the defendants provided qualified as a bona fide fringe benefit under applicable law: first, because the contractor defendants were reimbursed for a substantial portion of training costs, and second, because the contractor defendants used on-the-job training funds to compensate employees for work required under their government contracts.  Because Green's reimbursement claim is based upon the public disclosure of transactions from the news media and Green is not an original source of the information underlying his allegations, that claim will be dismissed for lack of subject matter jurisdiction.[2]  The on-the-job training claim will be dismissed because Green fails to plead fraud with particularity.

───────────────

[1] A fifth contractor defendant, Hospital Klean, filed an answer.  The resolution of the other defendants' motions to dismiss disposes of the claims against Hospital Klean.

[2] In the course of briefing the motions to dismiss, two defendants filed motions to adopt their co-defendants' motions. Green opposed on grounds that his claims as to the contractor defendants differ from those as to SCETTF and LIUNA and the motions failed to specify which arguments the movants seek to adopt.  Because the applicability of the arguments to the contractor and non-contractor defendants is sufficiently clear, the motions to adopt co-defendants' motions will be granted nunc pro tunc.

- 3 -

BACKGROUND

The complaint and accompanying materials set forth the following allegations and background.  Green was employed by defendant LIUNA as its International Representative from 1999 through 2001 and employed by defendant SCETTF as its Director from 2001 through 2004.  (Compl. ¶ 4.)  LIUNA is an international labor union for workers in a variety of fields, including in the service industries.  (Id. ¶ 7.)  SCETTF was established by LIUNA in 1978 to provide training and educational opportunities for LIUNA's members.  (Id. ¶¶ 8-10.)  To join SCETTF, a contractor must have a collective bargaining agreement ("CBA") with LIUNA representing its service employees.  (Id. ¶ 28.)  Membership in the two organizations thus is linked.  When a contractor becomes a member of LIUNA, it executes an agreement with LIUNA providing that the contractor will submit contributions to SCETTF in accordance with a set schedule and that both the contractor and LIUNA will be bound by SCETTF's Agreement and Declaration of Trust.  (Id. ¶ 29.)  In addition, the contractor executes an agreement with SCETTF that obligates it to contribute to SCETTF the compensation from its government contracts that go toward the costs of those fringe benefits financed by SCETTF.  (Id. ¶ 30.) Integrity Management Services, Crothall Healthcare, Kentucky Building Maintenance, National Maintenance, and Hospital Klean are each commercial contractors that, at relevant times, were

- 4 -

members of LIUNA, were members of SCETTF, and contracted with
government agencies to provide services.  (Id. ¶ 12.)[3]  Green's
complaint alleges that SCETTF, LIUNA, and the defendant
contractors defrauded the federal government by providing and
conspiring to provide claims, records, and statements that
falsely or fraudulently represented that fringe benefits provided
to the contractor's employees complied with the standards of the
McNamara-O'Hara Service Contract Act of 1965, Pub. L. 89-286, 79
Stat. 1034, 41 U.S.C. § 351 et seq. (the "SCA")[4] and related
Department of Labor ("DOL") regulations.

The SCA applies to certain contracts between an employer and
the United States that have the principal purpose of furnishing
services by service employees.  The DOL administers the SCA, and
is responsible for determining wage standards for workers in the
services industries.  (Id. ¶¶ 14-17.)  The SCA provides, in
relevant part:

Every contract . . . entered into by the United States
or the District of Columbia in excess of $2,500 . . .
the principal purpose of which is to furnish services
in the United States through the use of service

---

[3] In a table, the complaint provides a "Principal Offices"
location and "Contact Person" for each of the defendant
contractors.  (Compl. ¶ 12.)  In a separate table, the complaint
provides a list of the federal agencies with which the defendant
contractors had service contracts.  (Id. ¶ 33.)

[4] In 2011, the SCA was recodified at 41 U.S.C.A. § 6702 et
seq, and the relevant provisions were subject to stylistic
revision.  This opinion cites to the previous version relied on
by Green in his complaint.

>    employees, shall contain . . . [a] provision specifying
>    the fringe benefits to be furnished in the various
>    classes of service employees, engaged in the
>    performance of the contract or any subcontract
>    thereunder[.]

41 U.S.C.A. § 351(a)(2) (2010).  The SCA treats the provision of

fringe benefits to employees covered by a CBA in a distinct

manner.  "[W]here a collective-bargaining agreement covers any

such service employees," the provision specifying the fringe

benefits to be furnished is "to be provided for in such

[collective-bargaining] agreement, including prospective fringe

benefits increases provided for in such agreement as a result of

arm's-length negotiations."  Id.  The SCA defines fringe benefits

non-exhaustively as follows:

>    Such fringe benefits shall include medical or hospital
>    care, pensions on retirement or death, compensation for
>    injuries or illness resulting from occupational
>    activity, or insurance to provide any of the foregoing,
>    unemployment benefits, life insurance, disability and
>    sickness insurance, accident insurance, vacation and
>    holiday pay, costs of apprenticeship or other similar
>    programs and other bona fide fringe benefits not
>    otherwise required by Federal, State, or local law to
>    be provided by the contractor or subcontractor.

Id.  In addition, the SCA permits the federal government to

reimburse a government contractor for a plan providing fringe

benefits to its employees negotiated with its unions under a CBA.

(Compl. ¶ 19.)  Additional regulations require that "the

contractor's contributions for the benefits must be paid

irrevocably to a trust fund or third person pursuant to an

insurance agreement, trust or other funded arrangement," and that

- 6 -

"the trust or fund must be set up such that the contractor will not be able to (i) recapture any of the contributions paid, nor (ii) in any way divert the funds to its own use or benefit." (Id. ¶ 21 (citing 29 C.F.R. 4.171(a)(4)).)

A contractor with a CBA presents the information regarding the fringe benefits to be provided by submitting a form known as an "Addendum A" to a federal agency from which it seeks a services contract. (Id. ¶¶ 23-24.) When the federal agency awards a contract, that contract includes a provision specifying the fringe benefits to be furnished, and the contractor is compensated for the cost of the fringe benefits as part of the contract. (Id. ¶ 25.) The DOL Division of Wage Determinations maintains information regarding the terms of the service contract, including the fringe benefits agreed upon in a CBA. (Id. ¶ 26.)

Green alleges that the defendants engaged in a fraudulent scheme whereby each of the defendant contractors made contributions to SCETTF in the amounts paid to the contractors by the federal agencies with which they contracted and then SCETTF returned to the defendant contractors ninety percent of those contributions. (Id. ¶¶ 34-35.) While the purported purpose of the refund was to finance the contractors' provision of on-the-job training, classroom training, and third party training (id. ¶¶ 36, 45), the complaint alleges:

> At all times pertinent to this Complaint, those
> portions of above described recaptured contributions
> allocated by the Participating Contractors for on-the-
> job training were, in truth and in fact, used to
> compensate employees for performing tasks required by
> the contractors' service contracts, and thus were
> diverted by the Participating Contractors to their own
> use and benefit[.]

(Id. ¶ 46.)  The complaint further alleges that purported fringe benefits described as on-the-job training and class room training "did not meet the definition of 'fringe benefits,' and did not provide any effective or substantial benefit to the contractors' employees," regardless of whether those benefits were financed by the "recaptured contributions."  (Id. ¶ 47.)

In support of these claims, the complaint describes an SCETTF promotional website, established around 2003 and accessible until the date the complaint was filed, that allegedly demonstrated that the purpose of the trust fund was to enable participants to recapture and divert ninety percent of their contributions for training.  (Id. ¶¶ 37-43.)  The website compares two hypothetical companies, one of which is an SCETTF participant and one of which is not.  The non-participant, Company A, is listed as having specified hourly costs for an employee's "wages," "health insurance," "pension," and "training," and does not receive "government reimbursement" or "trust fund reimbursement."  Company B has the same costs, but is reimbursed twenty cents by the government and eighteen cents by the trust fund, SCETTF.  Green alleges that the promotional

- 8 -

website illustrates that the goal of SCETTF was to enable a
contractor to recapture ninety percent -- eighteen cents in the
hypothetical -- of the contractors' contributions to SCETTF,
which are represented in the hypothetical by the twenty cents of
government reimbursement for those contributions.  (Id. ¶ 43.)
Green alleges that, as a result, SCETTF enabled the contractors
"to incur no expenses whatsoever for fringe benefits, by allowing
them to provide no real or effective training."  (Id. ¶ 44.)

     In sum, Green alleges that the defendant contractors
fraudulently induced federal agencies to enter contracts by
submitting records in the form of the "Addendum A" to federal
agencies containing statements that the defendant contractors had
CBAs with LIUNA and that the contractors' service employees were
to receive fringe benefits financed by SCETTF of specified costs.
Green contends that such representations were "false and
fraudulent when so submitted as these [defendant contractors]
then knew that they did not intend to provide such fringe
benefits."  (Id. ¶ 48.)  Further, Green alleges that the
defendants negotiated service contracts with federal agencies
that included compensation for the provision of the above-
described fringe benefits, knowingly presented under the
contracts claims for payment in the form of periodic "Vouchers
for Services" to federal agencies that included compensation for
the provision of such fringe benefits, and knowingly and

deliberately failed to provide such fringe benefits to their
service employees under the service contracts.  (Id.)  Green
alleges that the federal agencies that negotiated, awarded, and
made payments under service contracts with the defendants "relied
upon the Addendum A records and the statements within such
records" in determining whether to award the contracts and the
compensation for the contracts.  (Id. ¶ 49.)  Green's complaint
lists several high-level individuals at LIUNA and SCETTF "who
were aware of, approved of, and participated in the fraudulent
activity described in th[e] Complaint."  (Id. ¶ 11.)  He alleges
that a "Contact Person" for each defendant contractor "knowingly
participated in, or knowingly executed the agreement whereby his
Contractor participated in the SCETT Fund, including its
specified provision for on-the-job training, classroom training,
and third party training."  (Id. ¶¶ 12-13.)

        The complaint alleges that the defendants concealed the
scheme by forwarding to the DOL's Division of Wage Determinations
information about the service contracts that contained false
representations about fringe benefits.  (Id. ¶¶ 50-51.)  The
information provided to the DOL was allegedly "material" to the
decisions of the federal agency to award contracts, "in that such
contracts become valid and enforceable only where the Secretary
of Labor . . . determines that the dollar value of the fringe
benefits included is that prevailing in the locality for the

classification in which the service employees are working." (<u>Id.</u> ¶ 52.)[5]

Green filed his complaint on April 22, 2009, asserting claims against SCETTF and LIUNA for FCA violations involving presenting fraudulent claims (Count One), claims against twenty-nine contractors for FCA violations involving presenting fraudulent claims (Count Two), claims against SCETTF and LIUNA for making false statements (Count Three), claims against the twenty-nine contractors for making false statements (Count Four), and claims against all defendants for conspiracy (Count Five). With regard to each count, Green alleges that the activity giving rise to liability occurred "[d]uring the period beginning in or about 1978 and continuing until the date of th[e] Complaint." (Compl. ¶¶ 57, 61, 65, 71, 77.) Green claims "direct and independent knowledge" of the information on which his allegations are based due to his employment with LIUNA and SCETTF, and asserts that none of the allegations in the complaint is "based upon a public disclosure." (<u>Id.</u> ¶ 5.) In 2011, the United States filed a notice of its election to decline

---

[5] Green's allegation regarding the role of the DOL misstates the statutory requirement. The requirement that the Secretary of Labor or his authorized representative determine that "fringe benefits to be furnished in the various classes of service employees . . . be prevailing for such employees in the locality" applies to service employees not covered by a CBA. 41 U.S.C.A. § 351(a)(2) (2010). Where a CBA covers service employees, as is discussed *supra*, the fringe benefits to be furnished are "to be provided for in such [collective-bargaining] agreement[.]" <u>Id.</u>

- 11 -

intervention in the case.  Green later voluntarily dismissed his claims against twenty-four of the contractors.

SCETTF, LIUNA, Integrity Management Services, Crothall Healthcare, Kentucky Building Maintenance, and National Maintenance moved to dismiss under Federal Rule of Civil Procedure 12(b)(1), arguing that the FCA's public disclosure bar eliminates subject matter jurisdiction over the action, and under Rule 12(b)(6), arguing that Green failed to plead fraud with particularity as required by Rule 9(b) and failed to plead factual allegations that any of the defendants presented a false claim for payment, made any false statements, or conspired to get the United States to pay a false claim.  In opposition, Green argued that the public disclosure bar does not preclude jurisdiction because Green falls within the FCA's original source exception and that his pleadings are adequate.  In support of his jurisdictional argument, Green submitted a declaration in which he states that "[a]s Director of the Fund, I became aware of the manner and means of its operation [sic] the fraudulent conduct of the Fund, LIUNA, and the contractors named as defendants in the case, which is the basis of the allegations in my Complaint." (Docket 70, Decl. of Gordon N. Green ("Green Decl.") ¶ 4.)  He lists his employment responsibilities at SCETTF as "includ[ing] the development of literature and other documents for the Fund, and facilitating card-check elections for the organization of

- 12 -

unions (as opposed to voting elections)," as well as "also
conduct[ing] training sessions for shop stewards, supervis[ing]
staff, and assist[ing] in contract negotiations." (Id. ¶ 3.)
Further, he states that he provided the information underlying
his allegations to the government by a submission dated April 2,
2009, before he filed his suit. (Id. ¶ 4.)

### DISCUSSION

Under the FCA, a private individual, termed a relator, may
bring a *qui tam* suit for penalties and treble damages against
anyone who knowingly presents, or causes to be presented, to an
officer or employee of the United States Government, a false or
fraudulent claim for payment or approval, or who knowingly makes,
uses, or causes to be made or used, a false record or statement
material to a false or fraudulent claim. 31 U.S.C.
§ 3729(a)(1)(A)-(B) (2006). A relator may also bring suit for a
conspiracy to violate the FCA. Id. § 3729(a)(1)(C). If the
action is successful, the relator is entitled to share in the
proceeds recovered. Id. § 3730(d)(2).[6]

---

[6] As is noted above, Green alleges that he was among the
perpetrators of the alleged fraud. (Compl. ¶ 11.) The FCA does
not prohibit a *qui tam* suit "brought by a person who planned and
initiated the violation of section 3729 upon which the action was
brought." 31 U.S.C. § 3730(d)(3). Rather, "the court may, to
the extent the court considers appropriate, reduce the share of
the proceeds of the action which the person would otherwise
receive . . . , taking into account the role of that person in
advancing the case to litigation and any relevant circumstances
pertaining to the violation." Id. A *qui tam* suit is barred,
however, "[i]f the person bringing the action is convicted of

- 13 -

I.   SUBJECT MATTER JURISDICTION

The FCA grants federal courts subject matter jurisdiction to hear a limited category of suits brought by relators.   31 U.S.C.A. § 3730(e)(4)(A) (2009).   A private individual may not sue alleging facts that were publicly disclosed before the suit was filed, where the individual is not an "original source" of the information.   The version of the Act in effect when Green filed his complaint provided:

> No court shall have jurisdiction over an action . . . based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the personbringing the action is an original source of the information.

31 U.S.C.A. § 3730(e)(4)(A) (2009).[7]

_____

criminal conduct arising from his or her role in the violation of section 3729."   Id.   Green pled guilty in 2004 to charges of bribery relating to an employee benefit fund and theft of employee benefit fund property arising from actions he took while serving with LIUNA and SCETTF, see United States v. Gordon N. Green, 2:04-cr-00062-CMR-1 (E.D. Pa. filed Feb. 11, 2004), and the public record of his conviction is subject to judicial notice.   Covad Commc'ns. Co. v. Bell Atlantic Corp., 407 F.3d 1220, 1222 (D.C. Cir. 2005).   There is no indication that his criminal conduct related to the FCA violations he now alleges.

[7] The public disclosure provisions were amended on March 23, 2010, but the Supreme Court held that the amendments were not retroactive.   Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 30 S. Ct. 1396, 1400 n.1 (2010). The version of 31 U.S.C. § 3730(e)(4) in effect at the time plaintiff's complaint was filed applies to the present action.

- 14 -

Jurisdiction is a threshold issue that must be resolved
before the merits of the case may be considered.  Rockwell, 549
U.S. at 470 (recognizing that "[w]hether the point was conceded
or not, . . . we may, and indeed must, decide whether [relator]
met the jurisdictional requirement of being an original source");
Vt. Agency of Nat'l Resources v. United States ex rel. Stevens,
529 U.S. 765, 778 (2000) (noting that "[q]uestions of
jurisdiction, of course, should be given priority -- since if
there is no jurisdiction there is no authority to sit in judgment
of anything else").  The plaintiff bears the burden of
establishing that the court has jurisdiction to consider his
case.  Moms Against Mercury v. Food & Drug Admin., 483 F.3d 824,
828 (D.C. Cir. 2007); see also Georgiades v. Martin-Trigona, 729
F.2d 831, 833 n.4 (D.C. Cir. 1984) ("It is the burden of the
party claiming subject matter jurisdiction to demonstrate that it
exists.")

A suit is jurisdictionally barred under § 3730(e)(4)(A) if
"either the allegation of fraud or the critical elements of the
fraudulent transaction themselves were in the public domain."
United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14
F.3d 645, 654 (D.C. Cir. 1994).  An "allegation" is a "conclusory
statement implying the existence of provable supporting facts,"
while a "transaction" is "an exchange between two parties or

things that reciprocally affect or influence one another." _Id._
at 653-54.  The D.C. Circuit represented the inquiry as follows:

> [I]f X + Y = Z, Z represents the _allegation_ of fraud
> and X and Y represent its essential elements.  In order
> to disclose the fraudulent _transaction_ publicly, the
> combination of X and Y must be revealed, from which
> readers or listeners may infer Z, _i.e.,_ the conclusion
> that fraud has been committed.

_Id._ at 654 (emphasis in original).  "Allegations or transactions"
that are sufficient to trigger the jurisdictional bar "raise[]
the specter of 'foul play'" so as to reveal the "questionable
legality" of an allegedly fraudulent practice.  _United States ex
rel. Findley v. FPC-Boron Employees' Club_, 105 F.3d 675, 687
(D.C. Cir. 1997).  The key question is "whether the publicly
disclosed information 'could have formed the basis for a
governmental decision on prosecution, or could at least have
alerted law-enforcement authorities to the likelihood of
wrongdoing.'"  _United States ex rel. Settlemire v. District of
Columbia_, 198 F.3d 913, 918 (D.C. Cir. 1999) (quoting _Springfield
Terminal_, 14 F.3d at 654 (internal quotations omitted)).  If the
public disclosure could have alerted the government to the fraud,
there is little value in permitting a private individual to sue,
and the FCA accordingly deprives courts of jurisdiction to hear a
_qui tam_ action.

To be subject to the jurisdictional bar, an action must be
"based upon" a public disclosure through the statutorily
specified means.  31 U.S.C.A. § 3730(e)(4)(A) (2009).  "[T]he

statutory phrase 'based upon' means 'supported by,' not 'derived
from.'"   United States ex rel. Schwedt v. Planning Research
Corp., Inc., 39 F. Supp. 2d 28, 33 (D.D.C. 1999) (quoting
Findley, 105 F.3d at 682).   The D.C. Circuit thus has
"constru[ed] . . . the jurisdictional bar to encompass situations
in which the relator's complaint repeats what the public already
knows, even though [the relator] learned about the fraud
independent of the public disclosures."   Findley, 105 F.3d at
683; see also United States ex rel. Hockett v. Columbia/HCA
Healthcare Corp., 498 F. Supp. 2d 25, 47 (D.D.C. 2007) (quoting
Findley, 105 F.3d at 682) (explaining that "[t]he courts of this
Circuit have . . . [held] that a relator's lawsuit is 'based
upon' a public disclosure if it is 'supported by' or is
'substantially similar' to the allegations or transactions
contained in the disclosure").

    An exception to the public disclosure jurisdictional bar
exists where a relator qualifies as an "original source."   The
FCA defines an "original source" to be "an individual who has
direct and independent knowledge of the information on which the
allegations are based and has voluntarily provided the
information to the Government before filing an action . . . which
is based on the information."   31 U.S.C.A. § 3730(e)(4)(B)
(2009).   Under the original source provision, the relevant
"allegations," which must be supported by information that the

relator directly and independently knows, are the ones made by
the relator in the complaint, not either the publicly disclosed
"allegations or transactions" referred to in subparagraph (A).
See Rockwell Int'l Corp. v. United States, 549 U.S. 457, 471
(2007).  Subparagraph B grants an individual original-source
status where, first, he has "direct and independent knowledge of
the information" on which his *own* allegations are based, and,
second, he has provided that information to the government before
filing suit.  Id. at 470-71.  The D.C. Circuit has defined
"direct" knowledge as knowledge "marked by absence of an
intervening agency," Springfield Terminal, 14 F.3d at 656
(internal quotations omitted), or "first-hand knowledge."
Findley, 105 F.3d at 690.  "[I]ndependent" knowledge is
"knowledge that is not itself dependent on public disclosure."
Springfield Terminal, 14 F.3d at 656 (internal quotations
omitted).  In tandem, the public disclosure bar and original
source exception seek an optimal balance between encouraging
suits by "whistle-blowing insiders with genuinely valuable
information" and discouraging claims by "opportunistic plaintiffs
who have no significant information to contribute of their own."
Id. at 649.

     In addition to the statutory requirements of direct and
independent knowledge of the information underlying a relator's
allegations and provision of that information to the government

before filing suit, the D.C. Circuit has inferred a third

requirement for an individual to qualify as an original source:

the individual must also "provide the information to the

government prior to any public disclosure." Findley, 105 F.3d at

691.  The Findley Court reasoned that a relator is not a whistle

blower, entitled to sue, unless he alerts the government to the

alleged fraud before the information is out in the public domain.

In support of its conclusion, the Findley Court interpreted the

"information" of which an original source must have direct and

independent knowledge to be that on which the public disclosure

is based.  As is discussed above, the Supreme Court in Rockwell

later held that the relevant "information" is that on which the

relator's own allegations are based, seemingly foreclosing

Findley's interpretation of the term.  Rockwell, 549 U.S. at 470-

72.  The D.C. Circuit has noted that the Rockwell decision "may

call into question the implicit requirement we identified in

Findley." Davis v. District of Columbia, 413 Fed. Appx. 308, 310

(D.C. Cir. 2011) (per curiam).  Nonetheless, "neither the Supreme

Court nor the D.C. Circuit has purported to overrule Findley's

pre-public disclosure notification requirement," United States ex

rel. Davis v. District of Columbia, 773 F. Supp. 2d 21, 33

(D.D.C. 2011), and "the central reason for Findley's holding,

that '[o]nce the information has been publicly disclosed . . .

there is little need for the incentive provided by a *qui tam*

- 19 -

action,' still has force[.]" <u>United States ex rel. McBride v.</u>
<u>Halliburton Co.</u>, Civil Action No. 05-00828 (HHK), 2007 WL
1954441, at *7 n.16 (D.D.C. July 5, 2007) (quoting <u>Findley</u>, 105
F.3d at 691). As <u>Findley</u> remains the law of this Circuit, Green
is subject to its pre-public disclosure notification requirement.

On a motion to dismiss for lack of subject matter
jurisdiction under Rule 12(b)(1), the plaintiff's factual
allegations are subject to closer scrutiny than they would be on
a motion to dismiss for failure to state a claim. <u>Flynn v.</u>
<u>Veazey Constr. Corp.</u>, 310 F. Supp. 2d 186, 190 (D.D.C. 2004); <u>see</u>
<u>also</u> 5B Charles Alan Wright, Arthur R. Miller, Mary Kay Kane &
Richard L. Marcus, <u>Federal Practice and Procedure</u> § 1350 (3d ed.
2011). In addition, "[i]n 12(b)(1) proceedings, it has been long
accepted that the [court] may make appropriate inquiry beyond the
pleadings to satisfy itself [that it has] authority to entertain
the case." <u>Haase v. Sessions</u>, 835 F.2d 902, 906 (D.C. Cir. 1987)
(internal quotations omitted).

A.   <u>Public disclosure bar</u>

The defendants argue that the "allegations or transactions"
upon which Green's suit is based were the subject of "public
disclosure . . . from the news media" within the meaning of
§ 3730(e)(4)(A) because the SCETTF website published in 2003
placed in the public domain information about the operation of
SCETTF and its training program. They also point out that all of

- 20 -

the SCETTF contractors are listed on the SCETTF website and the fact that the defendant contractors had service contracts with federal agencies is readily available on the Internet.  Green contends that the website "was nothing more than a self-promoting advertisement directed to a select audience, and was not in the nature of any traditional news source."  (Pl.'s Reply to Defs.' Joint Resp. in Opp'n to Relator's Mot. to Amend Exhibit E to his Opp'n to SCETTF's Mot. to Dismiss at 4.)[8]  Because "[s]ection 3730(e)(4) does not permit jurisdiction in gross," Rockwell, 549 U.S. at 476, the applicability of the public disclosure bar must be evaluated as to both Green's reimbursement claim and his improper on-the-job training claim.

---

[8] In opposing the motions to dismiss, Green did not dispute the defendants' proposition that the promotional website is a public disclosure with regard to all of his claims under the statute, but contended that jurisdiction is proper because he is an "original source" of the information upon which the allegations in the complaint are based.  (Pl.'s Consolidated Opp'n to Defendant Contractors' Mots. to Dismiss ("Pl.'s Consolidated Opp'n") at 6-8; Pl.'s Opp'n to Def. SCETTF's Mot. to Dismiss at 18-20.)  Some two months after filing his oppositions, however, in his reply in support of his motion to amend Exhibit E to his opposition to SCETTF's motion to dismiss, Green disputed the proposition that the website was "news media" within the meaning of the statute and that it constituted a public disclosure, providing no explanation for his failure to do so earlier.  (Pl.'s Reply to Defs.' Joint Resp. in Opp'n to Relator's Mot. to Amend Exhibit E to his Opp'n to SCETTF's Mot. to Dismiss at 4-5.)  Even were Green's belated challenge to be disregarded, the court "must satisfy [itself] that the parties' position is correct" because "§ 3730(e)(4) is jurisdictional." Rockwell, 549 U.S. at 470.

- 21 -

1.   Website as news media

The FCA does not define "news media," and courts that have

considered the issue have construed the term to include readily

accessible websites.  See United States ex rel. Brown v. Walt

Disney World Co., No. 6:06-cv-1943-Orl-22KRS, 2008 WL 2561975, at

*4 (M.D. Fla. June 24, 2008) (finding that a Wikipedia website

qualifies as "news media"), aff'd, 361 Fed. Appx. 66 (11th Cir.

2010) (per curiam); United States ex rel. Unite Here v. Cintas

Corp., No. C 06-2413 PJH, 2007 WL 4557788, at *14 (N.D. Cal.

Dec. 21, 2007) (finding that "[t]he 'fact' of the contracts

between [defendant] and the federal government was publicly

disclosed in the news media, as that information was available on

the Internet"); see also United States ex rel. Rosner v.

WB/Stellar IP Owner, L.L.C., 739 F. Supp. 2d 396, 407 (S.D.N.Y.

2010) (holding that a publicly-searchable database on a city

agency's website was an administrative report subject to public

disclosure bar).  In addition, the Supreme Court emphasized

recently that the specified channels of public disclosure

sufficient to trigger the jurisdictional bar should be construed

broadly.  See Schindler Elevator Corp. v. United States ex rel.

Kirk, 131 S. Ct. 1885, 1891 (2011).  In Schindler, the Supreme

Court interpreted the term "report" inclusively for the purpose

of triggering the statutory bar based on public disclosure by

means of "a congressional, administrative, or Government

- 22 -

Accounting Office report." Id.  In so doing, the Court noted

that "[t]he other sources of public disclosure in

§ 3730(e)(4)(A), especially 'news media,' suggest that the public

disclosure bar provides 'a broa[d] sweep.'"  Id.  (quoting Graham

Cnty. Soil & Water Conservation Dist. v. United States ex rel.

Wilson, 130 S. Ct. 1396, 1404 (2010)).

The promotional page at issue here was readily accessible to

the public on SCETTF's external website.  According to the

complaint, the website was designed specifically to advertise

participation in SCETTF.  (Compl. ¶ 38.)  A screen shot of the

website shows a simple Internet address[9] and there is no evidence

or contention that access to the website was limited to SCETTF or

LIUNA members or that the website was in any other way

restricted.  Cf. United States ex rel. Liotine v. CDW Gov't,

Inc., No. 05-33-DRH, 2009 WL 3156704, at *6 n.5 (S.D. Ill.

Sept. 29, 2009) (finding that where several steps had to be taken

to locate an article archived on a University's purchasing

services website, the publication was not a public disclosure by

the "news media"); see also United States ex rel. Radcliffe v.

Purdue Pharma, L.P., 582 F. Supp. 2d 766, 772 (W.D. Va. 2008)

(declining "to conclude that anything posted online would

---

[9] An exhibit submitted by Green shows a screen shot of the
website accessed on March 24, 2009 reflecting an Internet address
of http://www.scettf.org/pages/companyAB.htm.  (Green Decl., Ex.
9.)

- 23 -

automatically constitute a public disclosure"). That the SCETTF
website may have been "directed to a select audience" (Pl.'s
Reply to Defs.' Joint Resp. in Opp'n to Relator's Mot. to Amend
Exhibit E to His Opp'n to SCETTF's Mot. to Dismiss at 4),
presumably because of its subject matter, does not detract from
its ready accessibility. It remained unchanged, accessible at
the same Internet address, for approximately six years before
Green filed this suit. (Green Decl. ¶¶ 5-6.) Over this period
of time, thousands of professionals in the government services
industries and other visitors to the main SCETTF website could
have come upon it. While a website may not be a "traditional
news source" (Pl.'s Reply to Defs.' Joint Resp. in Opp'n to
Relator's Mot. to Amend Exhibit E to His Opp'n to SCETTF's Mot.
to Dismiss at 4), this particular website qualifies as news media
in light of the concerns motivating the FCA's public disclosure
bar, as recognized by this Circuit and the holdings in favor of
broad constructions of its terms.

    2.   The reimbursement allegation

Green alleges that the defendants are liable for false
claims because the training provided by SCETTF did not constitute
a bona-fide fringe benefit since the cost was reimbursed or
recaptured, in alleged violation of SCA regulations. With regard
to this claim, the SCETTF website was more than sufficient to "to
set government investigators on the trail of fraud." <u>Springfield</u>

Terminal, 14 F.3d at 655.  The FCA provides that a public

disclosure may be either of "allegations or transactions."  31

U.S.C.A. § 3730(e)(4)(A) (2009); see also Schwedt, 39 F. Supp. 2d

at 32 n.3 (emphasizing "disjunctive nature of 3730(e)(4)(A)").

The website sufficiently discloses transactions, potential

"exchange[s] between two parties or things that reciprocally

affect or influence one another."  Springfield Terminal, 14 F.3d

at 654.  The promotional website clearly illustrates that a

hypothetical trust fund participant would receive reimbursement

from both the government and the trust fund amounting to 90% of

its training costs.  From the website, a reader would be able to

infer that SCETTF might be reimbursing participant contractors

for contributions to the training fund and that SCETTF

participants therefore might be recouping contributions in

possible violation of regulations.  The SCETTF website

accordingly "raise[d] the specter of 'foul play'" so as to reveal

the "questionable legality" of the allegedly fraudulent practice.

Findley, 105 F.3d at 687.

     Green's reimbursement claim is also "based upon" the public

disclosure within the meaning of the statute because it is

"supported by" the information on the website.  Id. at 682.  As

courts of this Circuit have recognized, a suit need not be

"derived from" the public disclosure to come within the

jurisdictional bar.  Id.  Regardless of whether Green learned of

the alleged fraud from the website, "a relator's ability to reveal specific instances of fraud where the general practice has already been publicly disclosed is insufficient to prevent operation of the jurisdictional bar." <u>Settlemire</u>, 198 F.3d at 919. The fact that Green's complaint, for example, lists 31 specific entities that allegedly participated in the fraud makes no difference. Because Green's "complaint merely echoes publicly disclosed, allegedly fraudulent transactions that already enable the government to adequately investigate the case and to make a decision whether to prosecute, the public disclosure bar applies." <u>Findley</u>, 105 F.3d at 688.

　　　　3.　　The on-the-job training allegation

　　With regard to Green's claim that the defendants misrepresented the on-the-job training they provided or facilitated, the promotional page described in the Complaint does not constitute a public disclosure of relevant allegations or transactions. That website simply does not contain any information about the nature of the training financed by SCETTF. Defendant Crothall Healthcare described and submitted a screen shot of another page on the SCETTF website, which advertised that SCETTF would reimburse "30% of the wages of an employee designated to train other employees on the job," "100% of employees' wages while attending safety or training meetings," and "100% of the costs of a third party instructor." (Def.

Crothall Healthcare Mot. to Dismiss at 5.)  While Green does not dispute the accuracy of Crothall's representation of this page, the record is unclear as to how long this particular page was available on the Internet.  In addition, Green's allegation regarding on-the-job training does not necessarily rely on the SCETTF reimbursement that the page submitted by Crothall highlights.  While he alleges that recaptured funds "allocated by the Participating Contractors for on-the-job training were, in truth and in fact, used to compensate employees for performing tasks required by the contractors' service contracts," he also emphasizes that the training benefits provided were illegitimate "whether or not financed by the . . . recaptured contributions." (Compl. ¶¶ 46-47.)  Because the second website does not suffice to alert a reader that training funds might be used to compensate employees for contract-mandated work, the public disclosure bar does not preclude jurisdiction over this claim.[10]  Green's on-

---

[10] The defendants argue that two other obstacles bar jurisdiction over all of Green's claims, including that regarding the nature of the purported on-the-job training.  First, SCETTF argues that the court lacks jurisdiction because the Secretary of Labor has exclusive, discretionary authority over the interpretation, administration, and enforcement of the SCA. (Def. SCETTF's Mot. to Dismiss at 11-19.)  However, there is scant support for the proposition that FCA actions predicated on a contractor's alleged misrepresentation of adherence to arguably clear SCA regulations are precluded.  See, e.g., United States ex rel. Head v. Kane Co., 798 F. Supp. 2d 186 (D.D.C. 2011) (permitting FCA action alleging that contractors avoided payment of wages required under the SCA).  The correctness of Green's interpretation of the fringe benefits regulations is certainly not without doubt; however, his complaint can reasonably be read

- 27 -

the-job training allegation therefore will be evaluated on the

merits.  See Section II, infra.

   B.  Original source exception

   Because the public disclosure bar applies to Green's

reimbursement claim, subject matter jurisdiction exists over that

claim only if Green demonstrates that he is an original source by

establishing that he has direct and independent knowledge of the

information underlying his allegations and that he provided the

information to the government before filing his suit and before

the public disclosure.

   1.  Direct and independent knowledge

   Green must demonstrate direct and independent knowledge of

"any essential element of the underlying fraud transaction" on

which his allegations are based.  Springfield Terminal, 14 F.3d

at 657.  As Green affirmed in his briefing, he "alleges that the

---

to allege (although not with the particularity required under
Rule 9(b), see Section II, infra) that the defendants did not
provide training at all, but used funds allocated for that
purpose to pay for contract-required work.  This is a clear
enough violation of regulations requiring that fringe benefits be
provided to service employees.  Second, SCETTF argues that
jurisdiction is barred by 31 U.S.C. § 3730(e)(3), which provides
that "[i]n no event may a person bring a [qui tam suit] which is
based upon allegations or transactions which are the subject of .
. . an administrative civil money penalty proceeding in which the
Government is already a party."  (Def. SCETTF's Mot. to Dismiss
at 19-20.)  The defendant's proffered declaration and accompany
exhibits (id., Decl. of Terese M. Connerton) establishing
SCETTF's communication with DOL and the U.S. Air Force regarding
SCETTF's bona fide fringe benefit status does not suffice to
establish that any "administrative civil money penalty
proceeding" had been undertaken by the government.

- 28 -

contractors lied to the Government by stating to victim agencies they would provide bona fide fringe benefits to their employees, on service contracts awarded by those agencies." (Pl.'s Opp'n to LIUNA at 6.)  The contractors' representations and subsequent claims for payment under the service contracts were allegedly "lie[s]" because "[t]he benefits that they actually provided, and intended to provide at the time the statements were made, did not and could not qualify as bona fide fringe benefits" because the cost of the benefits was "ultimately recaptured by, or reimbursed to, the contractors[.]" (Id.)  As Green brings claims against SCETTF, LIUNA, and the contractor defendants, he must demonstrate direct and independent knowledge of the information underlying his allegations with respect to each one.

Green alleges in general terms that he "has direct and independent knowledge, within the meaning of 31 U.S.C. 3730(e)(4)(B), of the information on which the allegations set forth in this Complaint are based derived through his employment" at SCETTF and LIUNA.  (Compl. ¶ 5.)  In briefing, Green further contends that he qualifies as an original source because "[he] was the individual who designed and posted th[e] information on the Fund's website."  (Pl.'s Consolidated Opp'n to Defendant Contractors' Mots. to Dismiss ("Pl.'s Consolidated Opp'n") at 7 (emphasis omitted).)  This argument misunderstands the focus of the direct and independent knowledge inquiry.  As the Supreme

Court explained in <u>Rockwell</u>, original source status hinges on whether the relator has direct and independent knowledge of the information underlying his own allegations, not the information underlying the public disclosure.  <u>Rockwell</u>, 549 U.S. at 470-72; <u>see also</u> <u>Hockett</u>, 498 F. Supp. 2d at 51 (explaining that "the inquiry is not about whether relator was a source of the [public disclosure], but whether she had direct and independent knowledge of the information underlying her own . . . allegation of fraud").

Green's general assertion that he has direct and independent knowledge "derived through his employment" (Compl. ¶ 5) does not suffice to explain the basis of his knowledge of any elements of the alleged fraud committed by these defendants.  Green alleges a vast scheme, beginning in or about 1978 and continuing until April 22, 2009, the date he filed the complaint.  (Compl. ¶¶ 57, 61, 65, 71, 77.)  Green's own employment with LIUNA and SCETTF spanned the years of 2001 to 2004 only.  (Compl. ¶ 4.)  In briefing, Green concedes that a six-year statute of limitations applies and that alleged claims arising before April 22, 2003 are time barred.  (Pl.'s Consolidated Opp'n at 9.)  Even if the relevant period is limited to April 22, 2003 through Green's tenure at SCETTF in 2004, Green fails to demonstrate direct and independent knowledge of the alleged fraudulent activity.  And he does not begin to explain how he could have had first-hand

knowledge of what SCETTF, LIUNA, or any of the defendant contractors were doing after his tenure at SCETTF concluded.

With regard to LIUNA and SCETTF, Green's complaint lists several high-level individuals "who were aware of, approved of, and participated in the fraudulent activity described in th[e] Complaint." (Compl. ¶ 11.)  But Green does not explain how he came to learn of any specified individual's awareness, approval, or participation in the alleged fraud.  He does not describe any meetings he attended, communications to which he was privy, or any other source of knowledge.  Cf. United States ex rel. Hutcheson v. Blackstone Medical, Inc., 694 F. Supp. 2d 48, 60 (D. Mass. 2010) (finding relator an original source where the complaint alleged that relator "[i]n the regular course of her job duties . . . had access to email and internal documents and data which reflected the conduct discussed in the complaint, including communications and documents circulated among upper management").

With regard to the defendant contractors, the basis for direct and independent knowledge is similarly unexplained.  Green does not, for example, explain the nature or regularity of any of his interactions with any particular defendant contractor.  He merely lists a "Contact Person" for each defendant contractor, in each case the contractor's President, and alleges that such person "knowingly participated in, or knowingly executed the

- 31 -

agreement whereby his Contractor participated in the SCETT Fund, including its specified provision for on-the-job training, classroom training, and third party training." (Compl. ¶¶ 12-13.)  This general allegation that the defendant contractors were members of SCETTF leaves no basis for inferring that Green had first-hand knowledge of the false or fraudulent misrepresentations they are alleged to have made.

By way of comparison, in United States ex rel. Davis, a court considered a *qui tam* suit alleging that District of Columbia Public Schools (DCPS) had submitted Medicaid reimbursement claims without maintaining adequate supporting documentation.  Id., 773 F. Supp. 2d at 22.  The court found that the plaintiff had direct and independent knowledge of the lack of such documentation, an essential element of the claim, where the plaintiff's complaint alleged that plaintiff's firm, which was responsible for collecting and maintaining necessary documentation, and of which plaintiff was the chairman, itself retained the supporting documentation and never provided it to either DCPS or the firm that DCPS subsequently retained to replace plaintiff's firm.  United States ex rel. Davis, 773 F. Supp. 2d at 32 (citing United States ex rel. Davis v. District of Columbia, 591 F. Supp. 2d 30, 37 (D.D.C. 2008)).  Green has not pled that he observed first-hand the pay vouchers or supporting

documentation allegedly submitted by defendant contractors with false representations about the reimbursement scheme involved.

This case is closer to <u>Hockett</u>, another FCA action brought by a relator alleging Medicare fraud.  There, a court found the relator's assertion that she heard an alleged perpetrator of the fraud making incriminating statements insufficient to constitute direct and independent knowledge of certain information in the amended complaint because it "relie[d] on several layers of hearsay" and was "highly conclusory in nature, asserting legal conclusions rather than what was actually said."  <u>Id.</u>, 498 F. Supp. 2d at 53.  Green does not refer to any statements made by the individuals he lists at all, and his allegations are entirely conclusory.  That SCETTF promoted a program in which participants would be reimbursed for training was a matter of public disclosure since at least 2003 when the website was published. Green's allegations do little more that conclude, based on Green's own interpretation of the applicable regulations, that the reimbursement program that SCETTF promoted was not in compliance with the SCA.  Nowhere, however, does Green explain how he knows, rather than merely speculates, that the defendants misrepresented the nature or operation of SCETTF in order to get allegedly false or fraudulent claims paid.  "'[T]he relator must possess substantive information about the particular fraud, rather than merely background information which enables a

putative relator to understand the significance of a publicly
disclosed transaction or allegation.'" <u>Findley</u>, 105 F.3d at 688
(quoting <u>United States ex rel. Stinson, Lyons, Gerlin &
Bustamante, P.A. v. Prudential Ins. Co.</u>, 944 F.2d 1149, 1160 (3rd
Cir. 1991)).[11]

Finally, that Green includes himself among the alleged
perpetrators of the fraud does not obviate the statutory
requirement that an original source's direct and independent
knowledge be demonstrably of "the *information* on which the
allegations are based." 31 U.S.C.A. § 3730(e)(4)(B) (2009)
(emphasis added). Green lists his name among those "who were
aware of, approved of, and participated in the fraudulent

---

[11] The declaration Green submitted provides no better
explanation than does his complaint. Green states that the
general job responsibilities he held at SCETTF included
"develop[ing] literature and other documents for the Fund, and
facilitating card-check elections for the organization of unions
(as opposed to voting elections)," as well as "conduct[ing]
training sessions for shop stewards, supervis[ing] staff, and
assist[ing] in contract negotiations." (Green Decl. ¶ 3.)
However, Green does not tie any of these duties to his
allegations of fraud. He does not, for example, state that he
supervised staff involved in the fraud or that he assisted in any
of the contracts allegedly negotiated on the basis of fraudulent
representations about providing fringe benefits. And he does not
detail how he or anyone else perpetrated a fraud, stating only
that "[a]s Director of the Fund, [he] became aware of the manner
and means of [SCETTF's] operation [sic] the fraudulent conduct of
the Fund, LIUNA, and the contractors named as defendants in the
case, which is the basis of the allegations in [the] Complaint."
(<u>Id.</u> ¶ 4.) Simply asserting that Green's leadership position
made him aware of the fraud, without more, does not provide a
basis for concluding that Green had first-hand knowledge of the
fraudulent scheme alleged.

- 34 -

activity described in th[e] Complaint" (Compl. ¶ 11), but his
sole specific contention with regard to his own role is that he
created a website illustrating a hypothetical by which
participating contractors would receive 90% reimbursement for
training.  (Pl.'s Consolidated Opp'n at 7.)  Direct and
independent knowledge of the creation of a website promoting a
reimbursement program that may or may not provide fringe benefits
that comply with the SCA is not direct and independent knowledge
of an essential element of the fraudulent transaction, namely,
submitting false claims, making or submitting false records or
statements, or conspiring to do either.  Since Green plainly need
not await discovery before setting forth information about his
own actions, his reliance on generalities is significant.
Green's failure to explain what knowledge he has that he, or
anyone else at SCETTF, LIUNA, or the defendant contractors
submitted or caused others to submit false claims, provided or
caused others to provide or make false records or false
statements to get claims paid, or conspired to further a fraud,
precludes a finding that Green has "direct and independent
knowledge" of the information underlying his allegations.

        2.   Provision of information to the government

        Green's complaint does not assert that Green provided the
information underlying his allegations to the government before
filing suit as required by § 3730(e)(4)(B).  In his declaration,

however, Green contends for the first time that he "provided all of th[e] information [on which the allegations are based] to the United States Department Justice before filing my Complaint . . . by the submission of a sixteen page, single spaced memorandum, with exhibits, prepared by and transmitted by my attorney, dated April 2, 2009." (Green Decl. ¶ 4.)  Green does not include a copy of the memorandum submitted or any proof of mailing or receipt.  Rather, he attaches to his declaration "Exhibit 9 [to the] memorandum," which is a print out of the SCETTF website, and "Exhibit 1 to the memorandum," which is a piece of SCETTF literature including a description of reimbursement for on-the-job training.  (Id. ¶¶ 5, 7.)  Defendant Integrity Management argues that Green's representation of submission should not be credited because Green has "not produced proof of the submission and evidence of the Justice Department's receipt of the submission prior to April 22, 2009."  (Def. Integrity Management's Reply at 6.)

It is within a court's discretion to credit a plain statement made by a relator in a complaint that information was disclosed timely to the government.  See, e.g., United States ex rel. Hutcheson v. Blackstone Medical, Inc., 647 F.3d 377, 384 n.8 (1st Cir. 2011) ("[Relator's] complaint stated that she disclosed the allegations to the United States Attorneys' Office for the Middle District of Florida in the 'Summer of 2006' 'prior to

filing.'  This is more than enough.")  In this case, however, the
assertion of disclosure was absent from Green's complaint, and
the declaration specifies only that the disclosure was "dated
April 2, 2009," where the complaint was filed on April 22, 2009,
and lacks an affirmative representation regarding the date of
submission or any verification of receipt.  On such an issue of
jurisdictional import, the omission from the complaint of a
representation concerning disclosure to the government and
Green's decision to append only two exhibits to the memorandum
that Green purportedly sent to the government and not the
memorandum itself is troubling.  However, defendants cite no
authority for the proposition that proof of voluntary disclosure
to the government need be any more rigorous than submission of a
sworn declaration.  Green's sworn representation that he
disclosed the information underlying his allegations to the
government on April 2, 2009 therefore will be credited.[12]

---

[12] Two months after submitting his declaration, Green, in a
footnote in his reply in support of his motion to amend Exhibit E
to his opposition to SCETTF's motion to dismiss, represented that
he is "prepared to provide a copy of his disclosure memorandum
. . . to the Court, if required, in an *ex parte, in camera*,
submission."  (Pl.'s Reply to Defs.' Joint Resp. in Opp'n to
Relator's Mot. to Amend Exhibit E to his Opp'n to SCETTF's Mot.
to Dismiss at 5 n.4.)  Such a representation more properly would
have been made by Green at the same time that he submitted his
declaration.  Since his disclosure representation in the
declaration is being credited, *in camera* review of the disclosure
memorandum is unnecessary.

However, Green's representation of submission in April 2009 aside, Green clearly has not complied with this Circuit's requirement that he provide the information to the government before the public disclosure.  Contrary to Green's arguments, Findley remains binding precedent.  See supra at 17-18. "[N]either the Supreme Court nor the D.C. Circuit has purported to overrule Findley's pre-public disclosure notification requirement, and this Court will not 'lightly infer an abrogation of settled precedent.'"  United States ex rel. Davis, 773 F. Supp. 2d at 33 (quoting McBride, 2007 WL 1954441, at *7 n.16). Because Green's submission to the government on April 2, 2009 came years after the public disclosure of the allegedly fraudulent reimbursement scheme by means of the SCETTF website published in 2003, Green cannot qualify as an original source.

II.  FAILURE TO PLEAD FRAUD WITH PARTICULARITY

"[B]ecause the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b)[,]" which requires that allegations of fraud be pled with particularity.  United States ex rel. Totten v. Bombardier Corp., 286 F.3d 542, 551-52 (D.C. Cir. 2002).  This requirement "discourages the initiation of suits brought solely for their nuisance value, and safeguards potential defendants from frivolous accusations of moral turpitude."  United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd., 389 F.3d 1251, 1256

(D.C. Cir. 2004) (internal quotations omitted).  In addition, it
ensures that defendants have sufficient notice of the claims
against which they must defend.  <u>Id.</u>  Under Rule 9(b), "[the
relator] must set forth an *adequate factual basis* for his
allegations that the Contractors submitted false claims (or false
statements in order to get false claims paid), including a *more
detailed description of the specific falsehoods* that are the
basis for his suit."  <u>Totten</u>, 286 F.3d at 552 (emphasis added);
<u>see also</u> <u>Williams</u>, 389 F.3d at 1256 (requiring that "the pleader
. . . state the time, place and content of the false
misrepresentations") (quoting <u>Kowal v. MCI Commc'ns Corp.</u>, 16
F.3d 1271, 1278 (D.C. Cir. 1994).

Green has set forth neither an adequate factual basis nor
any detailed description of the specific falsehoods underlying
his claim that the defendant contractors used the money that
SCETTF reimbursed to them, or used government funds, not to
provide actual on-the-job training, but "to compensate employees
for performing tasks required by the contractors' service
contracts."  (Compl. ¶ 46.)  Notably, Green expressly disclaims
reliance on an implied certification theory of defendants'
liability.[13]  (<u>See</u> Pl.'s Consolidated Opp'n at 15 n.24 ("Mr. Green

_____

[13] False certification claims "rest[ ] on a false
representation of compliance with an applicable federal statute,
federal regulation, or contractual term."  <u>United States v.
Science Applications Int'l Corp.</u>, 626 F.3d 1257, 1266 (D.C. Cir.
2010).

- 39 -

does not allege an implied certification; he alleges an outright lie.")) Instead, he argues that the defendants affirmatively lied to the government and are liable on a fraudulent inducement theory, because they allegedly procured their contracts by means of false representations, rendering fraudulent all subsequent claims for payment. (See Pl.'s Consolidated Opp'n at 14-15 ("Relator alleges that the Defendants lied to the government agencies with which they contracted, stating that they provided their employees bona [fide] fringe benefits as those benefits are defined and allowed by the Department of Labor, fraudulently inducing those agencies to award contracts that included funding for services that were not provided, i.e., the bona fide fringe benefits to the contractors' employees.")) In addition, he alleges that the defendants knowingly presented false claims for payment, and submitted false records and statements in support of those claims. (Compl. ¶¶ 56-75.)

However, nowhere in the complaint does Green identify with particularity a single lie, or false representation, regarding on-the-job training made by any of the defendants to a government official in order to secure a contract, or in order to get a claim paid.[14] Green simply alleges that, over a period of some

_____

[14] In support of his opposition to SCETTF's motion to dismiss, Green submitted Exhibit E, identifying various federal service contracts awarded to certain contractors. He argued that the purpose of that exhibit was to demonstrate that, in the event his complaint was found deficient under Rule 9(b), he was

thirty years, every "Addendum A" submitted by the defendant
contractors to secure contracts and every Voucher for Services
submitted to secure compensation under contracts awarded
contained false representations about fringe benefits (Compl.
¶¶ 48-55).  This vast time span fails to afford the defendants
notice of which, if any, of the practices they may have
characterized as on-the-job training over that period of years
allegedly constituted work that they were required to perform
under their various government contracts.  Green's complaint
fails to provide even one representative example of an on-the-job
training practice engaged in by any contractor defendant that
constituted work required under a contract.  In addition, Green
fails to support his claim of conspiracy with any allegation of
agreement among the defendants.

With regard to the individuals his complaint lists as
involved in the alleged fraudulent scheme, Green fails to
articulate the roles any particular individual played or any lies

_____

prepared to amend it to identify the contracts he alleged were
secured through fraud.  (Pl.'s Mot. to Amend Exhibit E to Pl.'s
Opp'n to SCETTF's Mot. to Dismiss at 3.)  After the defendants
filed replies in support of their motions to dismiss, Green moved
for leave to amend Exhibit E, noting that he had omitted records
of the contracts awarded to four of the five defendant
contractors.  Green's motion will be denied.  Green's
contemplated amendment to identify federal service contracts
awarded to the defendants does not support Green's burden under
Rule 9(b) to state the time, place and content of the *false
misrepresentations* allegedly made to secure the contracts.
Neither do any of the other exhibits that Green proffered bear on
this point.

- 41 -

or misrepresentations made.  In Williams, the D.C. Circuit found

that a complaint had failed to plead fraud with particularity

where it "repeatedly refers generally to 'management' and

provides a long list of names without ever explaining the role

these individuals played in the alleged fraud."  Id., 389 F.3d at

1257.  The same is true here, where Green lists, without any

supporting details, high-level individuals at SCETTF and LIUNA

"who were aware of, approved of, and participated in the

fraudulent activity described in th[e] Complaint."  (Compl.

¶ 11.)[15]  Green's generalized pleading is "an especially

surprising deficiency given that [the relator] worked for . . .

and with [the defendants]" for several years.  Williams, 389 F.3d

at 1257.  In sum, there is no information in Green's complaint

that would support a reasonable inference that these defendants

told government officials that they would provide on-the-job

training or other training but instead used funds, either from

SCETTF or the government, to compensate their employees for work

required under their government contracts in violation of the SCA

or DOL regulations.

_____

[15] With regard to the defendant contractors, Green's
allegation that a "Contact Person" for each "knowingly
participated in, or knowingly executed the agreement whereby his
Contractor participated in the SCETT Fund, including its
specified provision for on-the-job training, classroom training,
and third party training" (Compl. ¶¶ 12-13) stops short of even
alleging that the listed individuals were aware of, approved of,
or participated in the alleged fraud at all.

- 42 -

CONCLUSION

The SCETTF website published in 2003 constitutes a public disclosure from the news media of the reimbursement scheme Green alleges.  Green's action is based on that publicly disclosed information, and his conclusory assertions of direct and independent knowledge of the information underlying his allegations do not withstand scrutiny.  In addition, Green's required disclosure of that information to the government was years too late under the law of this Circuit.  Because Green is therefore not an original source, the public disclosure bar precludes subject matter jurisdiction over the reimbursement claim.  While Green's claim that the defendants used on-the-job training funds to compensate employees for work required under their government contracts is not jurisdictionally barred, Green fails to plead the claim of fraud with particularity.  That claim therefore must also be dismissed.  A final order accompanies this memorandum opinion.

SIGNED this 13th day of February, 2012.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge